# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CARL WILLIAMS,**

                          **Plaintiff,**

**-vs-**                                                   **Case No.  6:05-cv-1469-Orl-JGG**

**COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,**

                          **Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Carl Williams ["Williams"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   PROCEDURAL HISTORY

On November 5, 2003, Williams filed a claim for disability insurance and supplemental security income benefits, claiming disability as of November 1, 2001 due to obesity, cellulitis, swollen legs, pain, and the need to use crutches from his pain.  R. 41, 54 - 55, 60.  His claim was denied initially and upon reconsideration.  R. 26, 32.  On April 20, 2005, the Honorable John Yeary, Administrative Law Judge ["ALJ"], held a thirty-minute hearing on Williams' claim.  R. 142 - 62.  The ALJ conducted the hearing by video from Charleston, West Virginia.  R. 143.  Non-attorney Robert Hicks represented Williams at the hearing in Orlando, Florida.  *Id.*  The ALJ heard testimony from Williams.  R. 142.

On May 25, 2005, the ALJ issued a decision that Williams was not disabled and not entitled to benefits.  R. 17.  Following a review of the medical and other record evidence, the ALJ found that Williams could not perform his past relevant work as a truck driver.  R. 15, 17, Finding 7.  The ALJ found that Williams nevertheless retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of sedentary work.  R. 17, Finding 11.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Williams was not disabled.  R. 17, Findings 12, 13.

The Appeals Council denied review on July 30, 2005.  R. 3 - 5.  On October 3, 2005, Williams timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 (complaint).  On May 3, 2006, Williams filed in this Court a memorandum of law in support of his appeal.  Docket No. 14.  On July 3, 2006, the Commissioner filed a memorandum in support of her decision that Williams was not disabled.  Docket No. 15.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Williams assigns four errors to the Commissioner.  First, Williams claims that the Commissioner erred in finding that Williams had the RFC to perform the full range of the physical exertional requirements of sedentary work without finding any additional non-exertional restrictions (as stated by examining and non-examining physicians).  Docket No. 14 at 2, 8 - 11.  Second, Williams claims that the Commissioner erred by failing to elicit the testimony of a vocational expert in light of Williams' severe non-exertional impairments.  *Id.* at 3, 11 - 14.  Third, Williams claims that the Commissioner improperly evaluated Williams' testimony on his pain.  *Id.* at 3, 14 - 16.  Fourth,

Williams claims that Commissioner erred in finding Williams' testimony and subjective complaints "not totally credible." *Id.* at 3, 16 - 18.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that Williams non-exertional limitations were not severe and did not limit his ability to perform the full range of sedentary work.   Docket No. 15 at 5.   Second, the Commissioner argues that exclusive reliance on the grids was appropriate in light of Williams' capacity to perform the full range of sedentary work. *Id.* at 6 - 9.   Third, the Commissioner argues that the ALJ properly evaluated Williams' pain testimony, subjective complaints, and credibility.   *Id.* at 9 - 10.

III.   **THE STANDARD OF REVIEW**

    A.   **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v.*

*Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

## B. REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

-4-

### C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a

sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

IV.   **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

A.   **DEVELOPING THE RECORD**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

**B.     THE FIVE STEP EVALUATION**

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985

F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite

the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.     OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations

are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.     TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the

accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or

the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.   PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

-13-

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

F.      CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### V.    APPLICATION AND ANALYSIS

### A.    THE FACTS

Williams was born on June 10, 1958, and was forty-six years of age on the date of the ALJ's decision.  R. 17, 44.  Williams worked as a truck driver for a freight company from 1980 through 2001.  R. 48, 55 - 56.  Williams claims disability as of November 1, 2001 due to obesity, cellulitis, swollen legs, pain, and the need to use crutches for his pain.[2]  R. 41, 54 - 55, 60.

---

[2]The ALJ used November 1, 2003 as Williams' onset date.  R. 10 - 11.  Williams did not note this error in his memorandum, but argues generally that he was disabled as of November 1, 2001.  *See* Docket No. 14 at 4.  In her memorandum, the Commissioner notes that while Williams reported earnings only through 2001, in his work history report, he stated that he worked as a truck driver in 2002 and that he worked as a truck driver until approximately August 2003.  Docket No. 15-1 at 2; *see also* R. 48, 64, 100.  At the ALJ hearing, Williams testified that he last worked on November 1, 2003.  R. 149.  Williams submitted medical records covering the period from October 15, 2003 through March 8, 2005, and did not submit any evidence covering the period prior to 2003.  The record is entirely devoid of evidence that Williams was disabled prior to November 1, 2003.  Substantial evidence supports the ALJ's decision to use November 1, 2003 as the onset date.

Williams visited his treating physician, Dr. Michael Ham-Ying on October 15, 2003.[3] R. 115. Williams complained of foot pain and swelling. *Id.* Dr. Ham-Ying noted that Williams "use[d] crutches for ambulation." The doctor assessed hypertension, edema, morbid obesity (Williams weighed 417 pounds); prescribed medication; and scheduled a follow-up appointment. *Id.* The doctor also advised Williams on diet, exercise, and the risks of smoking. *Id.* Williams returned on November 12, 2003 with complaints of pain in his feet and knees. R. 114. Dr. Ham-Ying assessed hypertension, impaired glucose tolerance, morbid obesity, and possible gout. *Id.* He prescribed medication. *Id.*

On December 2, 2003, Williams visited Dr. Ham-Ying. R. 113. Williams reported that the pain in his feet was "better," but that he still had pain in his knees. *Id.* In his notes, Dr. Ham-Ying wrote "crutches to aid ambulation." *Id.* Williams assessed gout, impaired glucose tolerance, morbid obesity, degenerative joint disease, and hypertension. *Id.*

On January 21, 2004, Dr. Alex Perdomo performed a consultative examination of Williams at the request of the Office of Disability Determinations. R. 100 - 101. Williams complained of swelling of the legs since developing cellulitis in the previous four years. R. 100. Williams also reported working as a truck driver until five months prior to the visit, and that he had to quit because of his swollen legs. *Id.* Williams further reported being unable to stand for more than ten or fifteen minutes and unable to walk without crutches. *Id.*

---

[3]Williams apparently sought treatment prior to October 15, 2003. In notes from that date, Dr. Ham-Ying stated that Williams appeared for a "[r]echeck" of his blood pressure. *See* R. 115. Williams, however, only submitted treatment notes covering the period from October 15, 2003 through March 2005. *See* R. 110 - 21, 135 - 40.

Dr. Perdomo observed that Williams walked down the hall with the assistance of crutches, and that while he was able to walk without the crutches, he limped as a result of his knee and ankle pain. *Id.*  The doctor also noted that Williams sat comfortably during the examination, and was able to mount and dismount the examination table "without any major problems." *Id.*  The physical examination revealed 1+ pitting edema bilaterally with superficial varicosities and evidence of stasis dermatitis around both ankles. R. 101.  The doctor noted moderate knee crepitus with tenderness was noted, as well as very painful bilateral knee flexion. *Id.*  Williams also had full range of motion of the cervical and thoracolumbar spine, and straight leg raise tests were negative. *Id.*  X-rays of the right and left knee revealed moderate osteoarthritis with narrowing of the intra-artricular space bilaterally. *Id..*

Dr. Perdomo assessed morbid obesity, osteoarthritis of the knees, gout by history, poorly controlled hypertension, mild renal insufficiency, mild diabetes, sleep apnea, and lower extremity venous insufficiency with stasis dermatitis. *Id..*  Dr. Perdomo stated that Williams "could definitely benefit from aggressive weight loss, as well as physical therapy and home exercise program for knee conditioning." *Id.*  He further recommended that Williams see an orthopedic specialist for more aggressive treatment on his knee, possibly to include cortisone injections. *Id.*  Dr. Perdomo concluded that Williams could stand and walk for two hours in an eight-hour day; sit for eight hours in an eight-hour day; lift and carry no more than ten pounds "mainly due to his pain and inability to walk without the assistance of crutches." *Id.*  Dr. Perdomo also opined that Williams should "avoid climbing, stooping, crouching, squatting or kneeling." *Id.*

-17-

Williams saw Dr. Ham-Ying again on February 3, 2004.  R. 112.  Williams told the doctor that his pain was "much better," but complained of sleep apnea.  *Id.*  The doctor assessed hypertension, morbid obesity, gout, degenerative joint disease of the knees, possible sleep apnea, and general anxiety disorder.[4]  *Id.*

On February 9, 2004, Dr. Keith Holden, a non-examining state agency physician completed a physical RFC assessment.  R. 102 - 109.  Dr. Holden opined that Williams could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for a two to four hours in an eight-hour workday; and sit for approximately six hours in an eight hour workday.  R. 103.  According to Dr. Holden, Williams was limited in his lower extremities due to degenerative joint disease in the knees.  *Id.*  The physician further opined that because of his morbid obesity and degenerative joint disease, Williams could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  R. 104.  Williams could never climb ladders, ropes, and scaffolds.  *Id.*  Williams had no manipulative, visual, or communicative limitations, but he had to avoid "even moderate exposure" to hazards such as machinery and heights.  R. 105 - 106.

On April 28, 2004, Williams saw Dr. Ham-Ying.  R. 111.  Williams told the doctor that he had not started his diet as recommended, although he was aware that he should.  *Id.*  He also reported experiencing pain when walking.  *Id.*  Dr. Ham-Ying noted edema in Williams' feet, and diagnosed

---

[4]Dr. Ham-Ying's notes are handwritten and often indecipherable.  *See, e.g.*, R. 110 - 15.  In his "assessment" from Williams' February 3, 2004 visit, Dr. Ham-Ying included "GAD" along with his other diagnoses, but did not further explain his diagnosis or findings.  *See* R. 112.  Dr. Ham-Ying continued to assess "GAD" after Williams' subsequent visits, but again, did not further explain his diagnoses.  *See* R. 110 - 11.  "GAD" could mean general anxiety disorder.  In his application for benefits, the hearing, and his memorandum, however, Williams did not argue that he was disabled due to any mental impairments.  See R. 54 - 59, 72 - 74, 141 - 62; *see also* Docket No. 14.

hypertension, gout, GAD, degenerative joint disease, and sleep apnea.  *Id.*  The doctor recommended that Williams continue taking his medications.  *Id.*

In a form dated June 2, 2004, Dr. Ham-Ying wrote answers to three handwritten questions (apparently from the Office of Disability Determinations) regarding Williams' physical impairments.[5] R. 110.  In answer to whether Williams needed a medical device to ambulate and "if so[,] what type and [sic] did you prescribe," Dr. Ham-Ying wrote "crutches."  *Id.*  The second question asked if a device were needed for ambulation, "[i]s it necessary at all times" and "[o]n what type of surfaces [is it necessary]?"  *Id.*  Dr. Ham-Ying answered "all."  *Id.*  The doctor further opined that degenerative joint disease and gouty arthritis as what caused Williams' need to use crutches.  *Id.*

On June 2, 2004, Williams visited Dr. Ahmed Masood of the Central Florida Pulmonary Group, P.A. upon referral from the Orange County Medical Center.  R. 122 - 24.  Williams reported shortness of breath upon exertion, fatigue, and sleepiness.  R. 122.  The doctor administered pulmonary function tests which showed no significant response to a bronchodilator, and failed to reveal "any significant obstruction."  R. 123, 125.  Dr. Masood noted that the test results showed only a "[s]light reduction in total lung capacity which could well be related to his morbid obesity."  R. 123. The doctor's impressions were was "[s]lowly progressive exertional shortness of breath which seems multifactorial" and was possibly due to morbid obesity, a "strong smoking history," and mild bronchospasms (that were possibly intermittent).  *Id.*  Dr. Masood also assessed osteoarthritis of the knee and a history of gout, and recommended that Williams undergo an overnight sleep study due to his possible sleep apnea.  *Id.*  The doctor advised Williams not to drive (due to the possibility of

---

[5]The form does not specify who wrote the questions, but the form is called the "Form SSA-5002."  *See* R. 110.

falling asleep) until undergoing the sleep study.  *Id.*  Dr. Masood prescribed an inhaler to help with the shortness of breath and a nicotine patch to help Williams quit smoking.  R. 124.

Another non-examining state agency physician, Dr. David Kitay, assessed Williams' physical RFC on June 13, 2004.  R. 126 - 33.  Dr. Kitay opined that Williams could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk at least two hours in an eight-hour workday; sit for approximately six hours in an eight-hour workday; and push and pull without limitation in his upper and lower extremities.  R. 127.  According to Dr. Kitay, Williams could occasionally stoop, kneel, crouch, and climb ladders, ropes, and scaffolds, but he had no other postural limitations.  R. 128.  Williams further had no manipulative, visual, communicative, or environmental limitations.  R. 129 - 30.

Williams visited Dr. Ham-Ying on July 27, 2004, and reported that his medication did not help his problems with breathing.  R. 140.  He also reported pain in his knees.  *Id.*  Ham-Ying's diagnoses remained the same as in his prior visits.  *See id.*  The doctor also told Williams that he "must" lose weight, and refilled his medications.  *Id.*  On September 21, 2004, Williams returned Dr. Ham-Ying as follow-up for his hypertension and to receive medication refills and treatment for his right leg (which he reported cutting on a piece of metal).  R. 139.  A physical examination revealed that Williams weighed 426 pounds and that his blood pressure was elevated.  *Id.*  Dr. Ham-Ying assessed cellulitis and a laceration of the leg, degenerative joint disease, morbid obesity, hypertension, and gout.  R. 139.

Williams returned to Dr. Ham-Ying on October 19, 2004 for a follow-up visit related to his leg wound.  R. 138.  In his treatment notes, Dr. Ham-Ying wrote that he was unable to weigh Williams

due to his crutches.  *Id.*  Dr. Ham-Ying assessed hypertension, cellulitis of the right leg, gout, and

chronic obstructive pulmonary disease, and refilled Williams' medication.  *Id.*  On November 24,

2004, Williams complained to Dr. Ham-Ying of drainage from the leg wound on his right leg, and

chronic obstructive pulmonary disease.  R. 137.  Dr. Ham-Ying assessed hypertension, gout, a venous

ulcer on his right lower extremity, and prescribed medications.  *Id.*  On December 22, 2004, Dr. Ham-

Ying saw Williams, and noted similar findings and recommendations.  *See* R. 136.  On March 8, 2005,

Dr. Ham-Ying recommended compression stockings for Williams' right leg.  R.  135.

    1.    <u>Testimony at the ALJ Hearing</u>

On April 20, 2005, Williams testified at the hearing via video conference from Orlando,

Florida.  R. 146 - 61.  The ALJ presided in Charleston, West Virginia.  R. 143.  Williams testified that

he weighed approximately 430 pounds, and that he had been around 400 pounds or more for the

previous four years.  R. 148 - 49.  He stated that he was on a diet, and that no doctors had suggested

that he undergo gastric bypass procedure.  R. 149.  Williams also testified that he last worked around

November 1, 2003, and that he stopped working because of pain in his knees.  *Id.*

Williams testified that a number of problems prevented him from working.  R. 150.  He stated

that he was unable to stand for a long period of time, and that he had to use crutches to walk.  R. 150.

He also reported going to school for job training, but that sitting caused his legs to swell, which in

turn, made him unable to walk.  *Id.*  According to Williams, he was able to sit for "a couple hours"

before his legs swelled.  *Id.*  He stated that elevated his legs and took water pills to stop the swelling.

R. 151.  He also reported having problems with a cut on his right leg that would not heal, and stated

that he was wearing wrappings to keep pressure on the leg.  *Id.*

In addition, Williams testified that he was able to dress himself and "take care of [his] personal needs." R. 152. He also stated that he took computer programming classes in September 2004, but quit the month before the hearing. R. 154. The classes were Monday through Friday, from 8:00 AM to 2:00 PM. *Id.* Williams testified that he left the house at 5:00 AM, and took the bus to arrive at school by 7:00 AM. R. 155. He explained that his teacher allowed him to get up and walk out of class if necessary "to keep [him] from sitting down too long." *Id.*

Williams estimated that he could sit for approximately thirty minutes before he would "have to stand up and move around." R. 157. He also stated that he would be able to walk the length of a football field, but that he would have to stop two or three times. *Id.* He further estimated that he could stand with his crutches for ten to fifteen minutes in one spot. *Id.* Without the crutches, he would only be able to stand for two minutes, and he was unable to move without his crutches. R. 157-58. Williams also testified that he was able to lift approximately thirty to forty pounds if he were standing in one spot, but he would be unable to walk while lifting. R. 158. He stated that he would be able to lift and walk with approximately ten to fifteen pounds. *Id.* Williams also explained that, according to Dr. Ham-Ying, Williams had possible sleep apnea, but that Williams had not yet been tested for it. R. 159.

2.    The December 2, 2003 Opinions of Dr. Ham-Ying

_____At the hearing, Williams' representative directed the ALJ's attention to "Exhibit 3F":

There was a form that was completed by Dr. Ham Ying on 12/2/03 which indicated that [William's] condition was permanent, that he had morbid obesity, edema in the lower extremities, hypertension, and was easily fatigued, and that he didn't believe [Williams] would be capable of getting out and even looking for work with these limitations.

R. 144 - 45.  In the record, the twelve pages of documents marked "Exhibit 3F" do not include the form referenced by Williams' representative.  *See* R. 110 - 21.  The only document in the record dated December 2, 2003 is one-page of treatment notes from Williams' visit to Dr. Ham-Ying on that date. R. 113.  At the bottom of this page, Dr. Ham-Ying wrote: "completed form."[6]  *Id.*

In his brief on appeal, Williams notes that his representative referenced the December 2, 2003 form by Dr. Ham-Ying, but that the form is not included in the record, and that the ALJ did not mention this form in his decision.  Docket No. 14 at 7.  Williams did not explicitly claim error due to the absence of the form, although Williams states that "it is not clear what happened to this very important document."  *Id.*  In her memorandum, the Commissioner argues that: 1.) "there is no indication from the exhibit list or the [ALJ] decision that [the form] was ever submitted"; 2.) "the proper course would be to submit [the form] together with a motion to remand for consideration of new evidence"; and 3.) the opinions in the form (as expressed by the representative's statement at the ALJ hearing) were opinions on a legal issue reserved for the decision of the Commissioner, and therefore not entitled to any weight.  Docket No. 15-1 at 8 - 9.

**B.      THE ANALYSIS**

1.      Non-Exertional Impairments

Williams first alleges that the Commissioner erred by finding that Williams' non-exertional impairments[7] did not significantly compromise his ability to perform the full range of sedentary work.

---

[6]As stated earlier, according to the treatment notes from December 2, 2003, Williams  reported knee pain, but reported improvement in his foot pain.  R. 113.  In his notes, Dr. Ham-Ying wrote, "crutches to aid ambulation," and assessed gout, impaired glucose tolerance, morbid obesity, degenerative joint disease, and hypertension.  *Id.*

[7]A non-exertional impairment is any impairment that does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull.  Social Security Ruling 83-10.  Non-exertional impairments thus include postural, manipulative, visual, communicative, and environmental limitations.  *Id.*; *see also* 20 C.F.R. § 416.945(d).

Docket No. 14 at 2, 8 - 11. Williams notes that Dr. Perdomo and the non-examining state agency physicians opined that Williams had non-exertional impairments, and that the ALJ improperly substituted his own opinions for those of the examining and non-examining physicians. *Id.* at 10. Williams further argues that in light of his non-exertional impairments (namely Williams' postural impairments, obesity, pain, and his need to use crutches to ambulate), the Commissioner should have consulted a VE, and erred by exclusively relying on the grids. *Id.* at 11 - 14.

Commissioner counters that the record fails to support Williams' contention that he had severe non-exertional impairments. Docket No. 15 at 5. The Commissioner observes that the non-exertional impairments mentioned by Dr. Perdomo and the state agency physicians are compatible with the requirements of sedentary work. *Id.* The Commissioner argues that the ALJ properly rejected Dr. Perdomo's opinions because they were "vague" and not supported by objective medical evidence. *Id.* at 6.

Social Security Ruling 96-9p provides guidance as to whether certain non-exertional impairments significantly limit a claimant's ability to perform sedentary work. For instance, postural impairments of the ability to balance, kneel, crouch, crawl, or climb ladders, ropes, or scaffolds "would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." *Id.* Therefore, the Commissioner is correct that Williams postural limitations alone do not affect his ability to perform the full range of sedentary work. However, in the case of a claimant who is medically-required to use crutches for walking, "it may be especially useful to consult a vocational resource in order to make

a judgment regarding the individual's ability to make an adjustment to other work."[8]  *Id.*  To find that

a "hand-held assistive device" (such as crutches) are medically required, Social Security Ruling 96-9p

provides that:

> there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9p.  Exclusive reliance on the grids is not appropriate when a claimant is unable to perform

a full range of work at a given residual functional level, or when a claimant has a non-exertional

impairment that significantly limits basic work skills.[9]

In this case, the ALJ found that Williams retained the RFC to perform the full range of

sedentary work, and specified that Williams could stand and walk for two hours in an eight-hour

workday; sit up to six hours in an eight-hour workday; and lift weights of up to ten pounds frequently.

---

[8]Social Security Ruling 96-9p provides further guidance on how the use of a "[m]edically required hand-held assistive device affects a claimant's ability to perform sedentary work:

> The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

[9] Social Security Ruling 83-10 defines "full range of work" as all or substantially all occupations existing at a given exertional level.  SSR 83-10.

R. 14 - 15.  The ALJ also found that "[t]he record does not objectively support any significant nonexertional restrictions, i.e., there is no persuasive objective medical support for his need to use crutches or to elevate his legs frequently throughout the day."  R. 15.

In making these findings the ALJ did not adequately address Williams' need to use crutches for walking as opined by Dr. Ham-Ying, Williams' treating physician.  While summarizing the medical evidence in the record, the ALJ stated, "In response to a questionnaire dated June 2, 2004, [Dr. Ham-Ying] said that the claimant was prescribed crutches for his degenerative joint disease and gouty arthritis, although this was not reflected in his treatment records."  R. 12; *see also* R. 110.  The ALJ also observed that Dr. Ham-Ying's treatment notes showed conservative treatment, and "did not in fact reflect the prescription of the use of crutches or that [Williams] needs to keep his lower extremities elevated."  R. 14.  Other than making these statements, the ALJ did not state a finding on Dr. Ham-Ying's opinions.

The ALJ never specified the weight he assigned the opinions.  Even assuming his two statements comprise an apparent rejection of Dr. Ham-Ying's note that the crutches were prescribed, the ALJ never addressed Dr. Ham-Ying's answer that crutches were necessary for ambulation on "all" surfaces at "all" times.  *See* R. 110.  Additionally, while the treatment notes do not necessarily reflect that Dr. Ham-Ying prescribed the crutches, the treating physician did note, during several visits, that Williams used crutches for ambulation.  *See* R. 113, 115.  Although Dr. Ham-Ying's questionnaire answers are concise, they are the only opinions in the record by a treating physician on the need for crutches.  The ALJ thus erred in failing to explicitly state the weight he assigned the treating

-26-

physician's opinions and his reasons for ignoring those opinions.[10]  Without the ALJ making the necessary findings, it is impossible for this Court to determine whether the Commissioner met her burden to prove that Williams could perform other work through exclusive reliance on the grids. Remand is necessary on this issue.

    2.    <u>Williams' Testimony</u>

Williams also claims that the Commissioner improperly evaluated Williams' testimony on his pain, and that the Commissioner erred in finding Williams' testimony and subjective complaints "not totally credible."  Docket No. 14 at 3, 14 - 18.  The Commissioner argues that the ALJ properly evaluated Williams' pain testimony, subjective complaints, and credibility.  Docket No. 15-1 at 9 - 10.

The ALJ must articulate "explicit and adequate reasons" for discrediting a claimant's testimony on pain.  *Foote,* 67 F.3d at 1561 - 62.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard" *Id.* at 1560.  In this case, Williams alleged disabling pain.  The ALJ, however, never stated a specific finding on Williams'

---

[10]Williams did not specifically request remand on the basis of the December 2, 2003 form completed by Dr. Ham-Ying.  Nevertheless, Williams asked the ALJ to consider a form containing additional opinions by his treating physician, which form is not now in the record and was never mentioned by the ALJ.  This also supports Williams' argument that remand is necessary.  In addition, the ALJ never addressed Dr. Perdomo's statement  that Williams "can lift and carry, but should limit the weight to no more than ten pounds mainly due to his pain and inability to walk without the assistance of a cane or crutches." R. 101.  The ALJ did note Dr. Perdomo's opinion that Williams had postural impairments due to obesity and knee pain, and assigned "limited weight" to Dr. Perdomo's opinions in light of Williams' own description of his activities of daily living and functional capabilities.  R. 14.  According to the ALJ, "his admitted activities do not reflect any significant restrictions on his ability to stoop, crouch, crawl, or climb stairs." *Id.*  The ALJ failed to explain, however, why Williams' activities showed that he did not need crutches for ambulation.  In fact, the ALJ even noted that Williams testified that he could "take care of his personal needs without assistance, use a computer, cook (while leaning on his crutches), shop (using the electric cart), and take the bus." R. 14.  These activities are not necessarily inconsistent with an "inability to walk without the assistance of a cane or crutches," and the ALJ failed to adequately explain his finding to the contrary.

pain testimony.  Instead, the ALJ cited the regulations related to pain (*see* R. 11, 13), and discussed Williams' general credibility.  The ALJ first stated: "The medical evidence establishes the existence of impairments reasonably likely to produce some of the symptoms and limitations alleged . . ."  R. 12.  The ALJ then stated that he evaluated Williams' testimony and written statements "and did not find him to be fully credible."  R. 14.  The ALJ next summarized Williams testimony (in particular, the testimony on his daily activities), and concluded that Williams' "admitted activities of daily living . . . and the conservative nature of his medical care served to discount his credibility as to the frequency and severity of his symptoms and the extent of his functional limitations."  *Id.*  Instead of stating a finding on the pain testimony, the ALJ made general credibility findings, and concentrated his discussion on discrediting Williams' alleged postural limitations, his need to keep his legs elevated, and his need to use crutches for ambulation**.**  *See id.*  The ALJ did not mention the Eleventh Circuit's pain standard.[11]  Remand is therefore required on this issue as well.

Additionally, Williams argues that in finding him not credible, the ALJ incorrectly characterized his testimony.  Docket No. 14 at 17.  The ALJ, in fact, found Williams "not . . . fully credible" but appeared to credit some of Williams' testimony.  *See* R. 14.  Nonetheless, Williams is correct that the ALJ misstated some of the testimony.  For instance, the ALJ noted that Williams "reportedly ceased working due to knee pain, but later in his testimony he said that he stopped working due to his mother's illnesses."  R. 14.  Williams, however, testified that he quit school because of his knee pain *and* because his mother became ill, and then stated that even if his mother had not become

---

[11]Of course, the ALJ is not required to refer to each legal standard he applied, but the ALJ's failure to mention and specifically apply the Eleventh Circuit pain standard lends support to Williams' argument that the ALJ erred by improperly rejecting Williams' testimony on pain.

ill, he would have still quit school because of his knee pain.  R. 160.  He testified: "I mean, I was always in pain when I was [at school], and it just was a struggle to sit there all day."  *Id.*

Also, the ALJ stated that Williams attended classes five days a week "from 8:00am to 5:00pm and admittedly did not have to elevate his legs."  R. 14.  Williams, however, testified that he attended classes from 8:00am to 2:00pm.  R. 154.  He did state that he could not elevate his legs during class "[b]ecause of the desk," but he also testified that "the teacher was aware of my problem, so he would let me get up and walk out of the class when I needed to, to keep me from sitting down too long."  R. 155.  This Court will not ordinarily disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  But the ALJ did not clearly articulate such a finding.  Rather, the ALJ relied heavily on a recitation of Williams' "admitted activities of daily living" in discounting Williams' testimony.  The case must be remanded for further findings.

## VI.    **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **REMANDED**  pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The Clerk should enter a judgment and close the case.

**DONE AND ORDERED** this 9th day of February, 2007.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and to:

-29-

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable John Yeary
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817